STATE of Missouri, Plaintiff–
Respondent,

v.

Frank SHIFKOWSKI, Defendant–
Appellant.

No. 23864.

Missouri Court of Appeals,
Southern District,
Division One.

July 31, 2001.

Motion for Rehearing and Transfer Denied
Aug. 22, 2001.

310

Ty Gaither, Joplin, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Stacy L. Anderson, Asst. Atty. Gen., Jefferson City, for Respondent.

SHRUM, Judge.

A jury convicted Frank J. Shifkowski (Defendant) of statutory sodomy in the

first degree, § 566.062.[1] The trial judge set his punishment at twenty years' imprisonment. Defendant appeals from the judgment of conviction and sentence. He charges the trial court erred by not suppressing his inculpatory statement due to non-compliance by police officers with the *Miranda* procedure and because the statement was extracted from him through duress, fraud, and psychological coercion. Defendant also contends the trial court committed reversible error when it excluded from evidence a videotaped interview of the victim. We affirm.

## FACTS

At the time of trial, Defendant was fifty-eight years old and was the stepfather of the victim. The victim was born July 19, 1986, making her thirteen years old at the time of trial. Viewed in the light most favorable to the verdict and the trial court's overruling of Defendant's motion to suppress, *State v. Rousan*, 961 S.W.2d 831, 845 (Mo.banc 1998), the facts are as follows:

Defendant married the victim's mother when the victim was six or seven years old. Following this marriage, the victim lived with her mother, her sister, and Defendant in Jasper County, Missouri. Defendant began molesting the victim soon thereafter. Without recounting all the sordid details, evidence presented via the victim's testimony and through Defendant's videotaped statement, if believed, proved the elements of the crime for which Defendant was convicted, i.e., statutory sodomy in the first degree.[2]

The victim first reported the sexual abuse to her paternal grandmother on October 31, 1999, after she heard a discussion on sexuality in her health class and realized what Defendant had been doing was wrong. The victim's grandmother reported the abuse by calling a hotline of the Division of Family Services. The victim was taken to the Children's Center in Joplin for a S.A.F.E. examination where she was examined by a physician who testified at trial that the results of the examination were consistent with the victim's allegations of sexual abuse.

On November 4, 1999, Defendant gave a videotaped statement to Detective Beckett of the Webb City police department in which he admitted there had been instances when he put his mouth on the victim's vagina and breasts. Before trial, Defendant moved to suppress this statement. The trial court denied the motion.

In November 1999, Defendant was working as an over-the-road truck driver. On November 4, 1999, after completing a trip with his truck, Defendant went with his wife to the Webb City, Missouri, police station where he first talked to Detective Beckett. The initial conversation between the two took place in Beckett's office. Before they talked, Beckett read a *Miranda* warning to Defendant, and Defendant signed a "waiver of rights form." After signing the waiver, Beckett asked Defendant why he was at the police station. According to Beckett, Defendant answered: "[H]is wife had told him that . . . her daughter had made some accusations about him." Beckett and Defendant then talked about the accusations for approximately one hour and fourteen minutes. During this time, Defendant's wife was waiting in the lobby of the police station.

---

1.  All statutory are references are to RSMo 2000 unless otherwise stated.

2.  In addition to the first degree sodomy charge, the State charged Defendant with first-degree-felony statutory rape of the victim in violation of § 566.032. The jury acquitted Defendant of this charge.

As their initial conversation proceeded, Beckett confronted Defendant with the accusations made by the victim, and Defendant "started laughing." Beckett then told Defendant that this matter "wasn't funny," but involved "serious" accusations.

Beckett then confronted Defendant with "some of the medical findings" and further evidence gained from interviewing others during the investigation which allegedly substantiated the victim's accusations. At this point, Defendant stated, "I'm thinking about talking to an attorney." Beckett then told Defendant, "That's your prerogative," and asked him, "[A]re you telling me that you are wanting an attorney?" Defendant's response to this question was that he was "thinking about one[,]" and continued talking and denying the accusations.[3]

Beckett then arrested Defendant and proceeded to talk with Defendant's wife for approximately forty minutes. At the conclusion of that interview, she was arrested for child endangerment and neglect.

Following the arrest of Defendant's wife, Beckett gave his superior, Chief of Police Richardson, an update about the status of the investigation. According to Richardson, Beckett reported, *inter alia*, that Defendant "was thinking about whether or not he wanted an attorney, but that he had not requested one." Richardson then had Defendant brought to his office so he "could visit with him." Richardson advised Defendant of his rights and stated no threats or promises had been made to Defendant to get him to talk. Richardson talked to Defendant for about twenty minutes, and Defendant never stated he wanted a lawyer. Richardson then contacted Beckett and told him that Defendant was ready to talk to him.

After Beckett left Richardson's office with Defendant in tow, he reminded Defendant of the "rights waiver he had already signed." Defendant then made the inculpatory statement which was the subject of his motion to suppress. The trial court overruled Defendant's motion to suppress and admitted Defendant's statement at trial over his objection.

Additional facts are given when required to analyze Defendant's claims of trial court error.

## POINT I: EVIDENTIARY ISSUE: RE-JECTION OF VICTIM'S TAPED STATEMENT

Defendant's first point charges that the trial court erred in sustaining the State's objection to the introduction of "a videotape of [the victim's] initial interview given to David Thaman at the children's center." Defendant insists the videotape was admissible as both substantive and impeachment evidence per § 491.074, RSMo 1994, and its exclusion was prejudicial to Defendant since there was a reasonable probability the outcome of the case was affected by the trial court's rejection of the videotape evidence.[4] To better understand this

---

3. Defense counsel deposed Beckett before the suppression hearing. At the suppression hearing, counsel cross-examined Beckett about his deposition testimony. Specifically, counsel read excerpts from Beckett's deposition as quoted in this paragraph and then asked Beckett if what he said in the deposition was correct. Beckett answered in the affirmative; consequently, the parts of Beckett's deposition testimony quoted, including the question, "[A]re you telling me that you

are wanting an attorney[,]" was part of the evidence before the trial court.

4. Section 491.074 was amended in 2000, but the 1994 version was in effect at the time of trial and provides as follows:

"Notwithstanding any other provisions of law to the contrary, a prior inconsistent statement of any witness testifying in the trial of an offense under chapter 565, 566 or 568, RSMo, shall be received as substan-

court's analysis of the first claim of trial court error requires a recital of additional facts.

During the investigative stage of this case, a DFS employee ("Thaman") interviewed the Victim. The interview was videotaped. At trial, defense counsel cross-examined Victim about alleged inconsistences between her testimony at trial and what she told Thaman during the DFS interview. Victim conceded her interview with Thaman had been videotaped, and her "at trial" testimony contained matters not mentioned in the videotape.[5]

As defense counsel continued to cross-examine Victim, it appears he started to lay a foundation for admission of the videotape by asking, "Have you had a chance to see that video?" Victim answered, "No." Defense counsel then asked if Defendant had ever threatened Victim. She answered: "He told me if I tell he would make my life miserable." Next, defense counsel asked: "Is that the same thing that you said on the videotape?" Victim answered, "Yeah, I'm pretty sure." At that point, defense counsel said to Victim: "Let me show you that videotape now and ask if, in fact, this is you on the videotape and it is a fair and accurate representation of what you said?" Before Victim answered, the prosecutor objected. He reminded the court that Victim had already testified she had not seen the videotape and argued that "[s]he can't authenticate this tape, and it is inadmissible to get in through this witness." Next came this colloquy between defense counsel and the court:

> "[DEFENSE COUNSEL]: Judge, that's not correct. If you see yourself

testifying and you know that you said, you know your own personage. You know what you look like in the video. She can testify, yes, that's me in there.

> "THE COURT: What's the purpose of showing her?

> "[DEFENSE COUNSEL]: I'm going to impeach her, judge.

> "THE COURT: With the entire tape?

> "[DEFENSE COUNSEL]: Yes, actually.

> "THE COURT: Objection sustained.

> "[DEFENSE COUNSEL]: All right, Judge. There are specifically instances in the tape which I've got numbered that I would like to impeach her with.

> "THE COURT: You cannot get it in through her. She said she had never seen it. Objection sustained.

> "[DEFENSE COUNSEL]: Then its a foundational objection, object to the foundation?

> "THE COURT: At this point it is."

Defense counsel then moved to other questions without further attempts to authenticate the videotape and without making an offer of proof regarding authentication. At the end of his cross-examination of Victim, defense counsel did ask leave to recall her as a witness. He explained that he intended to impeach Victim with the contents of the videotape after Thaman properly identified it for "foundational purposes." However, Thaman never testified, Victim was never recalled, and no evidence was presented to establish the item shown Victim was what Defendant claimed it to be, i.e., a videotape of Thaman's interview of Victim.

---

tive evidence, and the party offering the prior inconsistent statement may argue the truth of such statement."

**5.** At trial, Victim testified Defendant had "put his mouth on my vagina" and stuck "his penis

in my butt." During cross-examination, Victim conceded these two types of misconduct were not mentioned "in the videotape with Thaman."

■ It appears the trial court either ruled the videotape inadmissible because there was no authentication, or implicitly ruled that admission of the entire videotape raised the prospect that the jury would hear improper impeachment as to collateral matters, or irrelevant evidence, or inadmissible hearsay, or all of the foregoing.[6] Although Defendant now argues the videotape was admissible because of § 491.074, he never raised that specific theory of admissibility at trial. He never mentioned the statute during trial and affirmatively told the trial judge he was offering the evidence to impeach Victim. Accordingly, Defendant's Point I argument is not properly preserved for appellate review. *State v. Davidson*, 982 S.W.2d 238, 241[5] (Mo.banc 1998) (holding a claim that evidence was admissible under § 491.074, first raised on appeal, is not properly preserved).

■ Even so, we would ordinarily exercise our discretion and review this point under the plain error standard.[7] However, plain error review is impossible because Defendant never made an offer of proof about the content of the videotape. An offer of proof is necessary to preserve the matter for appellate review where the objection to the proffered evidence has been sustained by the trial court. *State v. Schneider*, 736 S.W.2d 392, 401[7] (Mo. banc 1987). "In order for an appellate court to judge whether or not the evidence should have been admitted, the court must first know exactly what evidence was excluded." *State v. Pisciotta*, 968 S.W.2d 185, 189[2] (Mo.App.1998). Neither the trial court nor this court has a clue about

what was recorded on the videotape Defendant tried to put in evidence. To address this claim of trial court error, even under the plain error standard, would require us to assume or speculate that the item proffered was the videotaped interview of the Victim *and* everything Victim said during the interview qualified as a prior and inconsistent statement under § 491.074. Because there was no offer of proof concerning the content of the videotape, Defendant's assignment of error cannot be considered, even under the plain error standard. *See State v. Nettles*, 10 S.W.3d 521, 528 (Mo.App.1999).

■ In so ruling, we note Defendant has tendered to this court what he claims is Victim's videotaped interview and has asked us to review the videotape and decide if it should have been admitted. We decline this invitation. First, this is a court of review; it is not our function to receive evidence never seen by the trial court, and based thereon, make an original determination. *Thummel v. King*, 570 S.W.2d 679, 686[8] (Mo.banc 1978). Second, it is not the duty of this court to become an advocate for any party to an appeal; that is the function of counsel. *Id.* at 686[9]; *State v. Bradley*, 8 S.W.3d 905, 906 (Mo.App.2000). Third, this court will not convict a trial court of error on a ground not presented to that court. *State v. Henderson*, 954 S.W.2d 581, 585[7] (Mo. App.1997). Fourth, the item filed with this court has not been authenticated, i.e., nothing before us establishes the item proffered is what Defendant claims it to be. *See State v. Kennedy*, 108 S.W.2d 384, 387 (Mo.1937); *State v. Swigert*, 852

---

6. The trial court's "implicit" reason for excluding the videotape is gleaned from the court's immediate sustension of the State's objection once the court learned that defense counsel proposed to use the *entire* videotape for impeachment purposes.

7. Rule 29.12(b) provides: "Plain errors affecting substantial rights may be considered in the discretion of the court when the court finds that manifest injustice or miscarriage of justice has resulted therefrom."

S.W.2d 158, 163–64 (Mo.App.1993). *See generally*, W. SCHROEDER, 23 MISSOURI PRACTICE, MISSOURI EVIDENCE § 901.1(a) at 6 (2000). Point denied.

## POINT II: ALLEGED FAILURE TO ABIDE BY MIRANDA PROCEDURE

Defendant's second point maintains the trial court erred by failing to sustain his motion to suppress statements he made to the Webb City police department. He insists he was compelled to incriminate himself by these statements in violation of the Fifth Amendment to the United States Constitution and Article I, § 19 of the Missouri Constitution. Defendant contends this occurred because, while in custody, he sought to protect his constitutional privilege against self-incrimination by telling the detective he [Defendant] "was thinking about talking to a lawyer." He insists such a request "was objectively and reasonably understood by the police officer to be a clear and unambiguous request for counsel in that the immediate response to this statement was the termination of the interrogation and incarceration of [Defendant.]" Relying on the premises that he was in "custody" when he made the "thinking about talking to a lawyer" remark and that the remark was sufficient to invoke his privilege against self-incrimination, Defendant asserts a later interrogation of him was constitutionally flawed, and the statements he made must be suppressed.

■ Initially, we note a trial court's ruling on a motion to suppress statements is interlocutory, *State v. Finster*, 963 S.W.2d 414, 417 (Mo.App.1998), and is subject to change during trial. *State v. Cardona–Rivera*, 975 S.W.2d 200, 203[3] (Mo.App. 1998). Accordingly, a motion to suppress, in and of itself, preserves nothing for appeal, and ordinarily, a point relied on that refers only to a ruling on such motion is fatally defective. *Id.* at 203[2]; *Finster*, 963 S.W.2d at 417.

■ The scope of an issue to be decided on appeal is that which is framed in the point relied on. *Cardona–Rivera*, 975 S.W.2d at 203. Defendant's second point relied on challenges only the trial court's ruling on the motion to suppress. No mention is made in the point or in the argument of any objection made by trial counsel or any error made by the trial court in the reception of the disputed evidence. Ordinarily, this would be fatal to any consideration of this point. *See State v. Hart*, 805 S.W.2d 234, 238 (Mo.App. 1991). Although the error was not properly raised on appeal, we exercise our discretion and review for plain error per Rule 29.12.

■ In reviewing a trial court's ruling on a motion to suppress, an appellate court will affirm the ruling if the evidence is sufficient to sustain the trial court's finding. *State v. Blankenship*, 830 S.W.2d 1, 14[18] (Mo.banc 1992). All facts and reasonable inferences therefrom are to be reviewed in the light most favorable to the order. *Id.* The weight of the evidence and credibility of witnesses are issues for the trial court to resolve. *State v. Kelley*, 953 S.W.2d 73, 87 (Mo.App.1997). Our review is limited to deciding if sufficient evidence existed to support the trial court's ruling. *Id.*

■ The Fifth Amendment prohibition against compelled self-incrimination provides an accused with the right to have counsel present during custodial interrogations. *Miranda v. Arizona*, 384 U.S. 436, 479, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694, 726 (1966). If an accused requests an attorney, the interrogation process must cease until an attorney is provided or until the accused reinitiates the process of his or her own accord. *Edwards v. Arizona*,

451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981). This request must be actual, unambiguous, and unequivocal to trigger the right. *State v. Bucklew,* 973 S.W.2d 83, 91 (Mo.banc 1998) (citing *Edwards* ). Without a clear assertion of the right to counsel, police officers may continue questioning. *Davis v. United States,* 512 U.S. 452, 460, 114 S.Ct. 2350, 2356, 129 L.Ed.2d 362 (1994). The question of whether a defendant has invoked his right to counsel is objective, that is, the inquiry is whether a "reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.* 114 S.Ct. at 2355.

■■■ Here, the trial court found that Defendant did not "make an unambiguous and specific request" for counsel during a "custodial interrogation." Assuming *arguendo* Defendant was in custody during the initial meeting with Beckett, the dispositive question is whether there is sufficient evidence in this record, measured by the "reasonable police officer standard," to support that finding. In arguing that we should answer this question in the negative, Defendant asserts Beckett's actions, i.e., promptly terminating the interrogation after Defendant made the "thinking about talking to a lawyer" remark, arresting Defendant at that point, and placing him in a cell, objectively demonstrated Beckett understood Defendant's remark to be a clear and unequivocal request for a lawyer. Such argument, however, ignores evidence from which a trial court could have found: (a) a "reasonable police officer" *would not* have believed Defendant was invoking his right to an attorney, and (b) there were reasons other than Defendant's "thinking about talking to a lawyer remark" why a "reasonable police officer" would have arrested Defendant at that point.

First, there is the evidence that when Defendant made his "thinking about talking to a lawyer remark," Beckett tried to clarify whether or not he actually wanted a lawyer. He did this by asking Defendant, "Are you telling me that you are wanting an attorney?" Defendant merely had to say "yes" in order to invoke his right to counsel, yet he did not do so. He simply stated, "I'm thinking about one." The *Davis* court noted that asking a "clarifying question" such as was done here is "good police practice" as it "help[s] protect the rights of a suspect by ensuring that he gets an attorney if he wants one, and will minimize the chance of a confession being suppressed due to subsequent judicial second guessing as to the meaning of the suspect's statement regarding counsel." 512 U.S. at 460, 114 S.Ct. at 2356. Despite Beckett's effort to protect Defendant's rights, Defendant responded in the same way and continued "talking" with Beckett. Second, Beckett talked with Defendant for one hour and fourteen minutes before he arrested him. During that time, Defendant's wife was waiting in another room. However, Beckett was not learning anything from Defendant, as Defendant continued to deny the accusations. When Beckett told Defendant about Victim's accusations, Defendant "started laughing." According to Beckett, he told Defendant "it wasn't funny." Only when finally confronted with medical evidence and others' statements, Defendant then made the "thinking about talking to an attorney" comment. However, Defendant continued in his denial of the accusations. Viewing Beckett's actions objectively, the trial court could have concluded Defendant's smug response to the horrid crime and lack of progress via the interrogation is what prompted Beckett to seek other avenues to arrive at the truth, and not that Defendant unambiguously and unequivocally invoked his right to counsel. We find

in the foregoing sufficient evidence for the trial court to conclude a reasonable police officer under similar circumstances would not have believed Defendant intended by his remarks to invoke his right to speak to an attorney.

We pause here to note Defendant cites three cases, other than those cited for general principles of law, which he maintains support his claim of prejudicial error. First, Defendant claims *Davis* held that the statement "I think I want a lawyer" followed by a termination of the interrogation was "unquestioned as sufficient to meet [the] standard of a clear and unambiguous request." Defendant's interpretation of the case is wholly implausible as the Court never addressed that issue, i.e., the "I think" statement. The Court *held* that a prior statement made by Davis ("Maybe I should talk to a lawyer") was not sufficient to invoke the right to counsel. In a sense, all non-issues will be unquestioned, and if questioned, those statements are merely dicta. *Davis* does not support Defendant's position.

Next, Defendant cites *State v. Wade*, 866 S.W.2d 908 (Mo.App.1993), for support. The case is inapplicable because the court never reached the question if the defendant's statement was sufficient to invoke the right to counsel, but held that even if the right was invoked, the defendant nevertheless reinitiated the questioning. *See Edwards*, 451 U.S. at 485, 101 S.Ct. at 1885 (assertion of right to counsel is no bar to further questioning if accused reinitiates

the interrogation process and makes a knowing, intelligent, and voluntary waiver).

Finally, Defendant claims *State v. Sahakian*, 886 S.W.2d 178 (Mo.App.1994), supports his assertions of error. Specifically, he says *Sahakian* is authority for holding that defendant's use of the expression, "I'm thinking about talking to a lawyer," was sufficient to invoke his Fifth Amendment right to counsel. We disagree. There are multiple reasons why *Sahakian* does not support Defendant's argument. First, the "I think" remark in *Sahakian* was not an issue there; accordingly, anything said by the *Sahakian* court is *obiter dicta*.[8] Second, Defendant ignores the context of the "I think" remark made in *Sahakian*. The accused there was being interviewed in a post-*Miranda* setting about a gun recovered from an airport murder scene. The *Sahakian* opinion recapped the final part of that interview as follows:

"The detective also asked defendant if he owned the gun retrieved from the scene. Defendant replied he did and that the detective should know that because it was a matter of record.

"Defendant then asked to make a telephone call to obtain the name of an attorney. At the conclusion of Defendant's call, the detective asked defendant if he wanted to talk any further. Defendant stated he *thought* it would be in his best interest not to say anything else until he obtained an attorney. He

8. In *Sahakian*, the accused argued that his initial refusal to sign a waiver of rights form along with his statement that he did not know what he should do, was such an equivocal and ambiguous assertion of his right to counsel that the detectives' only option was to ask clarifying questions. *See e.g., Wade*, 866 S.W.2d at 910 (holding when equivocal ambiguous request for counsel occurs, questioning need not stop; questions may continue but only to clarify the ambiguity). Based on this principle—which no longer attends in post-*Davis* cases—Sahakian argued that all his statements should have been excluded. Whether Sahakian's statement, "[I think] it would be in [my] best interest not to say anything else until [I] obtain an attorney," invoked his right to be free from self-incrimination was not an issue in *Sahakian*.

then commented that he just wanted to get it over with and to 'take him to the gas chamber.' The interview terminated at that point." (Emphasis added.) *Id.* at 180. We need not and do not express an opinion on whether the "I think" comment in *Sahakian* invoked the accused's privilege against self-incrimination. Suffice it to say, that the remark there, when read in context, is less ambiguous and clearer than what was said in this case. Finally, there were no clarifying questions asked in *Sahakian*, whereas an attempt to clarify was made here.

We believe the case is more akin to the following cases: *State v. Parker*, 886 S.W.2d 908, 918 (Mo.banc 1994) (statement "I ought to talk to an attorney" was ambiguous); *State v. Jones*, 914 S.W.2d 852, 860[14] (Mo.App.1996) (question "Do I need an attorney?" was ambiguous request for counsel); *State v. Wilkinson*, 861 S.W.2d 746, 748–49 (Mo.App.1993) (statement "Could I call my lawyer" was insufficient to invoke right to counsel); *State v. Michaels*, 860 S.W.2d 10, 11 (Mo.App.1993) (accused asking officer if he "would be willing to sit down with [accused] and his attorney and discuss this incident" was ambiguous request for counsel).

Constitutional privileges exist to protect those basic rights which the founders of this country thought necessary to the existence of a civilized society. *Davis* sets forth standards which one must follow to reap the benefits of a particular guaranteed right. Defendant wholly failed to abide by those standards when it is abundantly clear he had every opportunity to do so. No error appears, plain or other-

wise, in the trial court's ruling on Defendant's motion to suppress. Point denied.

## POINT III: INVOLUNTARINESS BECAUSE OF PSYCHOLOGICAL COERCION

Defendant's third and final point charges the trial court erred when it overruled his motion to suppress because his statement to Beckett was extracted from him through psychological coercion of such a degree that his will was overborne; consequently, Defendant insists the statement was involuntary and inadmissible. The principles of law upon which Defendant relies are lifted from *State v. Lytle*, 715 S.W.2d 910 (Mo.banc 1986):

"The test for 'voluntariness' is whether under the totality of the circumstances defendant was deprived of a free choice to admit, to deny, or to refuse to answer, and whether physical or psychological coercion was of such a degree that defendant's will was overborne at the time he confessed. When considering the totality of the circumstances, no single fact is dispositive, and in determining whether a confession was obtained by mental coercion, factors to consider include age, experience, intelligence, gender, lack of education, infirmity, and unusual susceptibility to coercion."

*Id.* at 915[5–7] (citations omitted).

Preliminarily, we note this is the only relevant case cited by Defendant in the argument section of his brief.[9] With these principles of law in mind, Defendant lists eight "acts and violations" which when viewed in the totality of the circumstances "exposes the involuntary nature" of the statements. Defendant merely lists events

---

**9.** Immediately following the quoted language from *Lytle*, Defendant pens "see also *State v. Simmon* [sic], 944 S.W.2d 165 (Mo.banc 1997)." This is the only mention of another relevent case regarding involuntary confes-

sions. Defendant cites two other cases for the proposition that involuntary confessions cannot be used to impeach a witness upon retrial. We need not consider these cases because we determine his confession was voluntary.

which allegedly occurred. He cites no authority that any of these events were coercive such to overcome his will or deprive him of a free choice. He does not develop his argument in any meaningful fashion, does not cite to the transcript, and does not cite any relevant authority other than a general principle of law. This is not sufficient to comply with mandatory briefing requirements; therefore, the point is not preserved for our review. *See State v. Hendricks*, 944 S.W.2d 208, 210 (Mo.banc 1997); *State v. Kitson*, 817 S.W.2d 594, 597[5] (Mo.App.1991).

Reviewing the record, *ex gratia*, we conclude no error appears. Two of the "acts and violations" relate to the initial questioning and Defendant's alleged assertion of his right to counsel. These suppositions of error have already been ruled adversely to Defendant. *See* Point II above. Another assertion is that he was promised release for his wife and him if he "would just admit to something." However, Beckett and Richardson testified no promises were made. The trial court was free to believe the officers and disbelieve Defendant. *State v. Delacruz*, 977 S.W.2d 95, 98[3] (Mo.App.1998). Also, Defendant asserts that the length of time over which the questioning took place, the fact that he was placed in a jail cell for part of this time, and that he was under arrest was somehow inherently coercive. Defendant arrived at the police station at 5:00 p.m. and confessed by 9:00 p.m. Of the four hours, Defendant was not continuously questioned. Greater lengths of time have not been found to be coercive. *See, e.g. Stein v. New York*, 346 U.S. 156, 73 S.Ct. 1077, 97 L.Ed. 1522 (1953); *Rousan*, 961 S.W.2d at 846[34] (Mo.banc 1998); *State v. Blackman*, 875 S.W.2d 122, 126 (Mo.App. 1994). Defendant further contends the police used improper interrogation techniques to coerce the confession, but does not identify the types of techniques. We fail to understand Defendant's argument in this regard due to the brevity, but suffice it to say, Defendant testified at the suppression hearing the police were "nice" to him, "no force" was applied to him to get him to confess, but he was "tricked" into believing that if he confessed to a sexual crime, he was free to go home. Beckett and Richardson testified that nothing improper occurred. Once again, the trial court was free to believe the officers. *Delacruz*, 977 S.W.2d at 98[3]. One final contention Defendant makes is that "none of the actions of the police were recorded and it was only when [Defendant] was ready to confess that the tape machine was turned on." This court wholly fails to understand what Defendant is attempting to argue by this statement. No independent research has uncovered any precedent which even remotely resembles a claim of involuntariness upon this basis.

This court has thoroughly reviewed the record and concludes Defendant's claim that his confession was involuntary is without merit. There was ample evidence supporting the denial of Defendant's motion to suppress, and the trial court did not err in so doing. Point III is denied.

PARRISH, P.J., concurs.

MONTGOMERY, J., concurs.