**STATE of Missouri, Plaintiff–Respondent,**

v.

**John Thomas MARKHAM, Defendant–Appellant.**

**No. 24021.**

Missouri Court of Appeals,
Southern District.
Division Two.

Jan. 10, 2002.

Amy M. Bartholow, Asst. Atty. Gen., Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Karen L. Kramer, Asst. Atty. Gen., Jefferson City, for respondent.

PARRISH, J.

John Thomas Markham (defendant) was convicted, following a jury trial, of manufacturing a controlled substance (Count I), § 195.211.2 [1], possession of methamphetamine, a controlled substance (Count II), § 195.202, RSMo 1994, possession of drug paraphernalia (Count III), § 195.233, and possession of ephedrine with intent to manufacture methamphetamine (Count IV), § 195.246. This court affirms.

■ For purposes of appellate review, the evidence at trial most favorable to the verdicts is accepted as true. *State v. Brown,* 58 S.W.3d 649, 651 (Mo.App.2001). Contrary evidence is disregarded. *Id.*

Defendant, Bryan McClure and Lisa Roberts were returning to Mindenmines, Missouri, from a trip to Weir, Kansas. They were travelling in defendant's Ford Bronco. Defendant was driving. Barton County Deputy Sheriff Larry Shaw observed the vehicle travelling at what he believed to be a high rate of speed. He followed the vehicle. It drove into the driveway at Bryan McClure's trailer. Deputy Shaw pulled his vehicle "kind of catty-corner, right behind [defendant's] vehicle." He asked defendant to come to his patrol car. Defendant got in Deputy Shaw's car. Deputy Shaw obtained defendant's name, date of birth and other information.

While Deputy Shaw and defendant were seated in the car, the deputy heard a noise coming from the Bronco. He saw someone inside the Bronco trying to get out. Deputy Shaw had seen Lisa Roberts get out of the Bronco when it stopped. He did not know there was another passenger.

Bryan McClure got out of the Bronco on the passenger side carrying a milk container. Deputy Shaw explained, "He ran alongside of my patrol car, on the passenger side of my patrol car and ran across the roadway. He had the milk container and he basically tossed what was in it out." Deputy Shaw shouted for him to stop, but he kept running. Deputy Shaw was unable to catch Mr. McClure.

Lisa Roberts got out of the passenger door of the Bronco when it stopped. She walked toward Bryan McClure's trailer. Deputy Shaw lost sight of Ms. Roberts. Later, he found her underneath a front porch deck at a neighbor's house. Deputy Shaw placed defendant in handcuffs before he found Ms. Roberts. Once he found Ms. Roberts, he placed her in handcuffs. He asked her what was going on. She told him "there was stuff in the house to make dope." He asked, "What kind of dope?" She answered, "Meth."

A search warrant was obtained and Bryan McClure's trailer was searched. Officers found fire extinguishers, a bag of lithium battery wrappers, glass containers with liquid, a measuring spoon, spoons with residue on them, a mirror with white powder on it, a razor, cooking stoves, a ziplock bag with white residue, a styrofoam cooler and tubing, syringes, four sets of scales, coffee filters, and a "bubble maker" in the trailer. The scales, tablespoons, ziplock bags, glass containers and syringes tested positive for residual amounts of methamphetamine and ephedrine or pseudoephedrine.

At trial, Lisa Roberts testified that she had seen defendant and Bryan McClure tearing batteries apart with pliers the day they were stopped by Deputy Shaw. She said defendant talked about making meth-

---

1. References to statutes are to RSMo Cum. Supp.1998 unless stated otherwise.

amphetamine; that he and Bryan McClure always talked about making methamphetamine when they were around her. She had seen defendant and Bryan McClure with brown crushed powder, spoons and needles.

Defendant has a son, Timothy Cain Markham. He was 13 at the time of trial. He goes by the name "Cain." Cain told the court and jury he saw his father and Bryan McClure "peeling batteries" in a shed by Bryan's trailer. Cain saw Bryan McClure crushing pills in his trailer. Defendant was with Bryan at the time.

Cain told about purchasing pills for his father. He was asked the following questions and gave the following answers:

Q. Have you told the jury about your purchasing pills for your dad?

A. We went to Wal–Mart and someplace in Oklahoma. My dad and Bryan went in and showed me what to get and I bought two boxes and my dad was waiting passed [sic] the check out aisles for me.

Q. And how did you get the money to purchase those pills?

A. My dad.

Q. When did he give you that money?

A. Before, right at the check out aisle.

Q. Before you checked out?

A. Yeah.

Q. Who was it that showed you which pills to purchase?

A. My dad.

Q. Do you recall what kind of pills you purchased?

A. Sudafed Cold and Allergy.

Defendant and Bryan purchased pills at the same store and at three other Wal–Mart stores.

Dr. Phillip Whittle, Director of the Missouri State Southern Regional Crime Laboratory, testified about methods for manufacturing methamphetamine. One of the methods was "the anhydrous ammonia, Lithium Method." Dr. Whittle was asked about ingredients required to make methamphetamine using the anhydrous ammonia lithium method. He answered:

They must have some precursor chemical that can be used to, to be reduced to Methamphetamine. The one that is commonly used is Pseudo–Ephedrine at this time, usually coming from tablets. Either over the counter tablets or some kind of counterfeit tablets. Ephedrine would also work, but it is not very available, at this point.

They need the anhydrous ammonia. They need some solvent usually, that has diethyl ether in it to dissolve the Pseudo–Ephedrine. This is part of the reaction as well. They need a metal, most generally lithium, occasionally sodium is used. This will get the actual reaction itself accomplished.

Then, they will need solvents to actually isolate the material away from the, the water and so forth that is involved in the reaction and the, usually an acid to convert the free base Methamphetamine, that is originally based into Methamphetamine hydrochloride.

This can either be muriatic acid that is added directly or a combination of, of sodium, either table salt or rock salt usually and some sort of concentrated sulfuric acid.

Dr. Whittle added that alcohol is sometimes used to extract the pseudoephedrine from the tablets; that acetone is used to purify the final solvent after it is finished.

Dr. Whittle told the court and jury that the most common source of lithium is lithium batteries. He said anhydrous ammonia is generally obtained from a farmer's

co-op or from a tank sitting in a field that contained the material for use as a fertilizer. He explained that glass containers, tubing, and coffee filters are often used to filter and process the methamphetamine.

■ Defendant's first point on appeal is directed to the trial court denying a request for mistrial following testimony that defendant had used methamphetamine in the past and overruling an objection to evidence that an explosive device was found in the trailer where defendant had been staying. Defendant asserts the trial court erred in its rulings because the evidence that was admitted was evidence of uncharged crimes.

Prior to trial, defendant moved to exclude evidence expected from his former wife, Cindy Markham, concerning prior methamphetamine use. The trial judge ruled that the evidence would be excluded, but might become admissible on rebuttal. The trial judge observed, "I guess, if he took the stand and said, well, I don't know what Meth is and I never used Meth, it certainly, I think would open up for, for rebuttal." The judge continued, saying he had "a little trouble" with the evidence being admissible in the state's case-in-chief; that his preliminary response, before commencing the trial, was that he would sustain the objection to such evidence.

One of the witnesses during the state's case-in-chief was Paula McClure, Bryan McClure's former wife. She was asked if she knew defendant. She answered that she did; that they met 15 years ago. She said defendant was a good friend of Bryan McClure when she and Bryan met. Ms. McClure was asked if she had any information or knowledge of Bryan being involved in the manufacture of methamphetamine. She answered, "No." She was asked, "What about [defendant]?" She answered, "No."

The prosecuting attorney asked Paula McClure if she had seen either of them use methamphetamine. She answered, "Fifteen years ago." Ms. McClure was asked who it was who had used methamphetamine. She answered, "All of us." She was asked if that included her. She said it did. The prosecuting attorney asked if she had knowledge about whether Bryan had used or manufactured methamphetamine after she no longer was living with him and before a search warrant issued in this case was executed. She said she did not.

There were no objections to questions asked Ms. McClure about defendant's prior drug use. The state continued its direct examination of her. She was asked about the floor plan of Bryan McClure's trailer—she had lived in the trailer with him before the dissolution of their marriage. She was asked whether defendant had stayed overnight in the trailer while she lived there and whether defendant's son had stayed overnight.

The state again addressed the matter of defendant's earlier drug use. Ms. McClure was asked, "When you observed the defendant use Methamphetamine, did you see his method of consumption or how it was used?" Defendant's trial attorney posed an objection. A bench conference followed at which the following dialogue occurred:

[DEFENDANT'S ATTORNEY]: Judge, although my Motion In Limine went to Cindy Markham, who I deposed and, the Court sustained the Motion In Limine, this can keep me out of this type of evidence. I think they are talking about use of Methamphetamine. She testified it was fifteen years ago.

I move for a mistrial, at this time. I would ask that counsel be instructed not to get into this line of questioning.

THE COURT: You're talking about old use?

[ASSISTANT ATTORNEY GENERAL]: Fifteen years.

THE COURT: I think I will sustain that, the objection, however, stated in the Motion In Limine. And I heard the testimony. The question is asked and answered without objection. And probably if there are, I am going to overrule the motion for a mistrial, at this time. Any other relief requested?

[DEFENDANT'S ATTORNEY]: No, thank you.

Cindy Markham, defendant's former wife, was also called as a witness. After testifying that their son had been with defendant for a period of time when she did not know their whereabouts, Ms. Markham told of going to Bryan McClure's trailer in Mindenmines. She said she smelled a strong chemical odor as she approached the trailer; that she associated the odor "with ether from high school and from drug usage, in the past." Ms. Markham said she previously used methamphetamine. She said it had been a long time since she had used the drug; that she stopped using it soon after her and defendant's marriage was dissolved in 1989. Ms. Markham was then asked, "Have you used Methamphetamine with the defendant?" She answered, "Yes." The attorney for the state proceeded to ask another question that was interrupted by an objection by defendant's attorney. A bench conference occurred at which defendant's attorney moved for mistrial. He contended the question about whether Ms. Markham had used methamphetamine with defendant violated the trial court ruling granting defendant's motion in limine. The trial judge stated that he was "almost

tempted" to grant a mistrial. He concluded, however, that he would not.

■■■ Mistrial is a drastic remedy. *State v. Smith,* 32 S.W.3d 532, 552 (Mo. banc 2000); *State v. Hill,* 929 S.W.2d 258, 263 (Mo.App.1996). "The decision whether to grant a mistrial is left primarily to the trial court, which is in the best position to determine whether the complained-of incident had any prejudicial effect on the jury." *State v. Smith, supra.* "Refusal to grant a mistrial will be overturned only if the trial court abused its discretion." *State v. Hill, supra.* A mistrial should be granted only in extraordinary circumstances. *Id.*

Paula McClure testified, without objection, that defendant had used methamphetamine in the past. The state made the same inquiry of Cindy Markham. She answered that he had. After Ms. Markham answered, defendant objected. Even if defendant's objection is considered timely, evidence of defendant's past use of methamphetamine was cumulative.

■■■ "Admitting evidence of misconduct or uncharged crimes does not result in reversible error if like evidence has previously been admitted and the evidence to which objection has been raised is thus merely cumulative." *State v. Alexander,* 875 S.W.2d 924, 931 (Mo.App.1994). "It is not error to admit normally inadmissible evidence over objection when the evidence is cumulative." *State v. Head,* 834 S.W.2d 898, 899 (Mo.App.1992). The trial court did not abuse its discretion in denying defendant's requests for mistrial.

■■■ The second claim of error in Point I is directed to testimony of Deputy Shaw about an explosive device that was found in Bryan McClure's trailer.[2] Deputy Shaw

2. Arguably, defendant's inclusion of two separate claims of error in Point I is multifarious

and, therefore, contrary to Rule 84.04(d). Although this opinion reviews both complaints

was asked about a number of photographs he took inside and outside the trailer. The photographs were taken in conjunction with the execution of the search warrant for the trailer. His testimony included references to an item he characterized as "an exploding device ... found that was in the east bedroom, up in the shelf, up in the shortest shelves."

Deputy Shaw was asked to describe items depicted in the photographs he had taken. The photographs were marked for identification. The ones of the "exploding device" were marked State's Exhibit Nos. 23 and 24. No objection was posed when Deputy Shaw was asked to characterize, and did characterize, what State's Exhibit Nos. 23 and 24 depicted. The state moved for the admission of the photographs in evidence. State's Exhibit Nos. 23 and 24 were included in a request to admit 12 separately numbered photographs, State's Exhibit Nos. 8, 5, 6, 9, 15, 16, 17, 18, 19, 20, 23 and 24.

When the request was made to admit the exhibits in evidence, defendant's trial attorney asked to voir dire Deputy Shaw. The trial court permitted defendant's attorney to inquire. He asked Deputy Shaw about the location in the trailer where one of the photographs, State's Exhibit No. 16, had been taken. He then showed Deputy Shaw another of the photographs, State's Exhibit No. 45, and asked if it was "the same thing." At the conclusion of the voir dire of Deputy Shaw, defendant's attorney announced that he had no objection. The trial court thereupon admitted the exhibits that had been tendered by the state in evidence, including the photographs of the "exploding device," State's Exhibit Nos. 23 and 24.

The state continued with its direct examination of Deputy Shaw. Questions were asked about State's Exhibit Nos. 23 and 24 on two more occasions. The state's attorney asked without objection, "State's Exhibit Number 23 and 24, now that the jury can see these, can you tell the jury what these are?" The deputy answered, "Umm, it was some kind of an explosive device that was found in the east bedroom. It had BB's, nails, a shotgun shell, cigarette lighters, all wrapped up, all wrapped up together." He continued, "Where we actually found it, you can see up there in Exhibit Number 7. It was up there in the shelf, where we located it at."

After lengthy additional testimony, Deputy Shaw was asked about another exhibit, State's Exhibit No. 58. He was asked to identify the exhibit. Deputy Shaw stated, "That is the, the exploding contraption that was made that was in the east bedroom." He was asked if that was what State's Exhibit Nos. 23 and 24 depicted. He answered, "Yes." The state offered State's Exhibit No. 58 in evidence. Defendant's attorney told the trial court, "Oh, I guess I object on relevance, Judge." The trial judge replied, "The Court is going to admit, assuming the State will tie it up."

■ The initial evidence concerning the explosive device was photographic evidence, State's Exhibit Nos. 23 and 24. When the exhibits were offered in evidence, after explanations were given of what the photographs depicted, defendant's attorney announced he had no objection. An announcement of "no objection" amounts to an affirmative waiver of appellate review of the issue. *State v. Patino,* 12 S.W.3d 733, 740 (Mo.App.1999). *See also, State v. Burge,* 39 S.W.3d 497, 499 (Mo.App.2000). Under those circum-

---

set out in Point I on their merits, the practice of including disparate claims of error in a single point relied on should not be followed.

*See DeCota Elec. & Indus. Supply, Inc. v. Continental Cas. Co.,* 886 S.W.2d 940, 941 (Mo.App.1994).

stances, even plain error review is not warranted. *Patino, supra.*

The fact that another exhibit that depicted the same device, State's Exhibit No. 58, was objected to "on relevance" is of no consequence. The record on appeal does not reveal it was anything but cumulative of the evidence to which there was an affirmative waiver of appellate review. Point I is denied.

■■■ Defendant attempts to raise a double jeopardy issue in Point II. He contends the trial court "plainly erred" in sentencing him for offenses charged in Counts II, III and IV; "that the count of manufacturing methamphetamine [Count I] was a continuing course of conduct that was prosecuted in separate parts in Counts II, III and IV." By asserting that the trial court "plainly erred," defendant tacitly acknowledges he did not assert the double jeopardy claim he states in Point II in the trial court. This court addressed the same circumstance in *State v. Gaver*, 944 S.W.2d 273 (Mo.App.1997), holding:

> [I]t is well-settled that double jeopardy is a personal right which, if not properly raised, is waived. *State v. Miner*, 748 S.W.2d 692, 693 (Mo.App. E.D.1988). As appellant was remiss in raising his double jeopardy claim at trial and in post-trial motions, we find appellant has waived this right.

*Id.* at 279, *quoting State v. Baker*, 850 S.W.2d 944, 947 (Mo.App.1993). *See also, Rost v. State*, 921 S.W.2d 629, 635–36 (Mo. App.1996), and *Horsey v. State*, 747 S.W.2d 748, 754–56 (Mo.App.1988), for detailed discussions and analyses of this issue. Point II is denied.

Neither of defendant's remaining points on appeal was preserved for appellate review. They were not presented to the trial court in defendant's motion for new trial. Rule 29.11(d). *See State v. Crenshaw*, 852 S.W.2d 181, 185 n. 4 (Mo.App. 1993), *citing State v. Pullen*, 843 S.W.2d 360, 362 (Mo. banc 1992). Defendant requests plain error review as permitted by Rule 30.20.

■■■ Point III is directed to defendant's trial counsel's prior representation of Lisa Roberts, a witness who testified against defendant at trial. Point III argues that "[t]he trial court plainly erred in allowing defense counsel to represent [defendant] after the state endorsed Lisa Roberts as a witness, without making a record that [defendant] was waiving his right to conflict-free counsel...."

Prior to trial, the state advised the trial court that Ms. Roberts was expected to testify in the case. The attorney for the state told the trial court that a felony case had been pending against Ms. Roberts; that a negotiated plea agreement had been reached in the case. Ms. Roberts' case was in Vernon County. The trial court was told the case had been dismissed in exchange for Ms. Roberts' cooperation in the case against defendant. The attorney stated, "It also came up in the deposition that [defendant's trial attorney] and his office represented her in that case for a period of time, before ... conflict counsel may have got in, named Tim Burdick."

Defendant's trial attorney told the trial court that when his office determined Ms. Roberts was a witness in defendant's case, his office "got out of whatever cases we had on Mrs. Roberts." Defendant's attorney stated his office did nothing in the negotiation of Ms. Roberts' agreement with the state.

This court addressed a similar complaint to that asserted in Point III in *State v. Wright*, 934 S.W.2d 575 (Mo.App.1996). The error asserted in *Wright* was reviewed for plain error. *Wright* held, "To be entitled to relief, there must have been an actual conflict of interest that adversely

affected counsel's performance on defendant's behalf." *Id.* at 581. Here, as in *Wright,* the record does not disclose defendant was prejudiced by defendant's trial attorney's involvement with Ms. Roberts' case that was later dismissed upon her agreement to cooperate with the state in its case against defendant. " 'Speculation, conjecture and surmise will not serve to fill' a void when a party fails to demonstrate why he was prejudiced by a claimed conflict of interest. *[State v.] Murphy,* 693 S.W.2d [255] at 261 [ (Mo.App.1985) ]." *Chandler v. State,* 859 S.W.2d 764, 767 (Mo.App.1993). This court's review of the record in this case discloses no manifest injustice or miscarriage of justice. *See* Rule 30.20. Point III is denied.

█ Point IV contends the trial court plainly erred in allowing the state to present testimony and argue in closing argument that Lisa Roberts told the truth; that this "constituted improper personal vouching" for her credibility. This court has previously declined to review claims of plain error directed to closing argument to which there was no objection at trial. *State v. Nunley,* 992 S.W.2d 892, 895 (Mo. App.1999); *State v. Link,* 965 S.W.2d 906, 910–11 (Mo.App.1998). As stated in *Link:*

> In *State v. Silvey,* 894 S.W.2d 662, 670 (Mo.banc 1995), the Missouri Supreme Court declined to grant plain error review with reference to the state's closing argument, explaining that "plain error review 'should be used sparingly and does not justify a review of every trial error that has not been properly preserved for appellate review.' " *Id.* at 670 (citing *State v. McMillin,* 783 S.W.2d 82, 98 (Mo.banc 1990), *cert. denied,* 498 U.S. 881, 111 S.Ct. 225, 112 L.Ed.2d 179 (1990)). "Relief should rarely be granted on assertions of plain error as to closing argument because, 'in the absence of objection and request for

relief, the trial court's options are narrowed to uninvited interference with summation and a corresponding increase of error by such intervention.' " *Silvey,* 894 S.W.2d at 670 (citing *State v. Clemmons,* 753 S.W.2d 901, 907–08 (Mo.banc 1988), *cert. denied,* 488 U.S. 948, 109 S.Ct. 380, 102 L.Ed.2d 369 (1988)).

*Id.* This court declines to grant plain error review regarding the part of defendant's complaint in Point IV directed to closing argument.

█ The remaining part of Point IV is directed to testimony elicited from Ms. Roberts concerning the truthfulness of statements made before trial and statements she made during the course of her testimony. She was asked if the information she previously gave was truthful and if the testimony she had just given at trial was truthful. She testified that both had been truthful. This was not "personal vouching" in that it did not involve a prosecutor implying that he or she had facts that were not before the jury for its consideration. *See State v. Vaughn,* 32 S.W.3d 798, 800 (Mo.App.2000), *citing State v. Wolfe,* 13 S.W.3d 248, 256 (Mo. banc 2000). Point IV is denied. The judgment is affirmed.

GARRISON, P.J., and PREWITT, J., concur.