**STATE of Missouri, Respondent,**

v.

**Thomas K. SMITH, Appellant.**

No. 26698.

Missouri Court of Appeals,
Southern District,
Division Two.

Feb. 10, 2006.

Motion for Rehearing or Transfer Denied
March 3, 2006.

Application for Transfer Denied
April 11, 2006.

M. Shawn Askinosie and Teresa L. Grantham, Springfield, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Shaun J. Mackelprang, Asst. Atty. Gen., Jefferson City, for respondent.

ROBERT S. BARNEY, Judge.

Thomas K. Smith ("Appellant") appeals his conviction for murder in the first degree, a violation of section 565.020.[1] Following a jury trial, the trial court sentenced Appellant to a term of life imprisonment without the possibility of parole. Appellant now brings six points of trial court error discussed below. We affirm the judgment of the trial court.

Viewing the evidence in the light most favorable to the jury's verdict, *State v. Chaney*, 967 S.W.2d 47, 49 (Mo. banc 1998), on January 19, 2003, Keith Allen ("Allen"), his live-in girlfriend, Holly Zlotopolski ("Zlotopolski"), and her sons were cutting wood on his property when they saw Appellant driving through their field. Throughout the afternoon, they made several trips to their home to unload wood and during that time they continued to encounter Appellant on their property.[2] At some point in the late afternoon, Allen became frustrated with Appellant's appearance on his property and told Zlotopolski that he wanted she and her sons to return to the house. Allen told Zlotopolski "he was going to find out what [Appellant] wanted." Allen and Zlotopolski got into

his truck, the two children got onto their bicycles, and they started for home. On their way back to the house, they passed Appellant, who was standing in their neighbor Dennis Bryant's ("Bryant") front yard drinking a beer. When their truck slowed down to pass Bryant's house, Allen told Zlotopolski that Appellant was "a puss."

After dropping Zlotopolski and the children off at the house at 4:20 p.m., Allen told them he was leaving "to go lock the gate, he didn't want [Appellant] up there on the hilltop." Zlotopolski never saw him alive again.

At around 7:30 that evening, Myron Dixon ("Dixon") and Odie Atchison ("Atchison") were "coon hunting" in the area surrounding Allen's property. As they approached Johnson Rowe Road, they saw in the road "a S15 pickup [parked and running] with a gentleman [later determined to be Allen] lying underneath the pickup." Dixon stated that Allen, who "wasn't moving," was lying on the ground behind the open driver's side door of the truck "in front of the back wheel" and there was "a ball cap laying out in the middle of the road." Dixon and Atchison drove past the truck, parked, and called 9–1–1.

Deputy Shawn Cox ("Deputy Cox") arrived on the scene within five minutes. Dixon and Atchison walked up to the truck with Deputy Cox and Dixon noticed that Allen "was lying in a pool of blood, and that he was probably dead." Dixon also noticed that there appeared to be marks on the truck from shotgun pellets "just above the body and kind of on the inside of

---

1. Appellant was also charged with armed criminal action pursuant to section 571.015; however, the State dismissed that charge during trial.

2. Appellant and Allen were neighbors who had known each other for approximately four years. When Appellant's children visited him on the weekends, he would often bring them to Allen's house so that they could play with Zlotopolski's sons.

the bed [of the truck] and on the back of the cab" and there was a rifle lying underneath the truck.

Deputy Cox testified that when he arrived on the scene at 7:45 p.m. he observed Allen's "body lying underneath a truck." Deputy Cox noted that Allen's "head and part of [his] shoulders were under the back end of the truck;" there was "a large amount of [coagulated] blood, quite a bit around [Allen's] body;" there were "injuries to [Allen's] head and neck, arms ...;" there was a gun lying underneath the vehicle; and there was no movement or response from Allen.

When the police began investigating Allen's death, Appellant's name "came up" almost immediately when the officers interviewed Zlotopolski. Around midnight that evening, Deputy Cox and several other officers went to Appellant's home, which was about half a mile from the scene of Allen's murder. Upon arrival, Lieutenant Tim Gideon ("Lieutenant Gideon") advised Appellant of his *Miranda*[3] rights and Appellant acknowledged that he understood those rights. When Deputy Cox did a "protective sweep" of the house to make sure there were no other occupants, he located "a deer rifle and a handgun" as well as some shotgun shells and a "marijuana pipe."[4] Additionally, the officers located a "black-powder rifle" in Appellant's truck, which was parked outside his

home, and which also showed signs of recent damage.[5]

Missouri State Highway Patrol Sergeant Rob Vaughn ("Sergeant Vaughn") interviewed Appellant that evening at his home. According to Sergeant Vaughn, Appellant, who appeared to be intoxicated, stated that he knew Allen but "had not really seen or even talked to Keith Allen in two years." Appellant told Sergeant Vaughn that he and Allen "used to be friends, but that Mr. Allen had gotten involved with methamphetamine and [Appellant] didn't want to be around him." Appellant went on to state that he had seen Allen driving several times that day, but did not know anything else.

After being interviewed by Sergeant Vaughn and the officers, Appellant was placed under arrest for possession of a marijuana pipe, which was found near a chair Appellant had been occupying. He was then taken to the Stone County Jail. After being repeatedly interviewed at the Stone County Jail and continually denying his involvement, Appellant finally admitted to being involved in Allen's death and agreed to show the police "where the rifle—the .12 gauge shotgun was hidden in the woods outside [his] residence."

Testifying on his own behalf at trial, Appellant asserted that he shot Allen in self-defense. He stated that he had not been on Allen's property on the evening in question. He testified that at around 4:30

---

3. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

4. The shotgun shells were later identified as being the same type of shells found at the scene of Allen's murder.

5. At the scene of the crime, the officers noticed "[o]n the rear bumper of [Allen's] truck there was a straight-line scratch mark that went through the dust ..." and "a small dent on the [black] bumper that [was] pushed in...." Later, the officers impounded Appel-

lant's truck because "[o]n the front right-hand side of the bumper there was a small, [recent] black speck and small—like a fresh mark which [they] thought would be compared to the black scratch on the back of Keith Allen's [truck]." Lieutenant Gideon testified that the black marks on Appellant's truck appeared to be "paint transfer" from Appellant's truck coming into contact with Allen's vehicle. Appellant later admitted that he ran into Allen's truck when he was fleeing the scene.

in the afternoon he went to feed corn to some wild turkeys on a piece of land adjoining his property. He stated that he "loaded [his] truck with some corn, got [his] shotgun, and went ... out to the woods...." To access the adjoining property, he drove through an unlocked gate to an old logging road and fed the turkeys. While he was feeding the turkeys, he heard a truck which he suspected was Allen's and he went back toward the gated entrance to the logging road.

When Appellant approached the gate on his return, he saw Allen's truck "in the middle of the road" and Allen "was standing outside of his truck." Appellant stated that he stopped his truck about "three or four car lengths" from Allen, at which time his shotgun was sitting on the seat next to him. According to Appellant, Allen came right up to his truck window and started screaming and yelling at him and told him that he was "going to blow [Appellant's] f-ing head off if he catches [Appellant] over there on his land." Appellant stated that he tried to explain to Allen that he had not been on his property, but that Allen would not listen to him. Appellant testified that he did not feel threatened at that time, but instead thought that Allen "had had a bad day and he was going to take it out on [him]." "[T]he next thing [Appellant] kn[e]w [Allen] was running back to his truck." Appellant stated that Allen then "pulled a gun out." Appellant stated that at that time he was "scared out of [his] brain" and "thought [he] might get shot right there on the spot." When he saw the gun, Appellant stated that he grabbed his own gun, jumped out of his truck, and ran behind his truck to hide. Then he "just stuck [his] gun around the side of the truck, figuring [he] would scare the living crap out of [Allen] ..." and fired. Appellant stated that although he remembers firing his gun only once that day, he understood that the evidence showed Allen

was shot several times. He went on to state that his shotgun was a pump action gun and that he must have pumped it several times in order to have fired it repeatedly, but he did not specifically recall doing so.

Appellant testified that after firing at Allen, he "got back in [his] truck and figured [Allen] was probably hiding behind the truck ... So [he] just got in [his] truck and left." He stated that he could not get past Allen's truck, which was parked in the road, so he ran into it with his truck and pushed it out of the way and drove home. Appellant stated that when he went past Allen's truck he did not see him lying on the ground and he had no idea he had actually shot Allen. When he got home, he stated that he waited in the woods for an hour or so before going in the house because he suspected that Allen would come after him. Eventually Appellant tired of waiting for Allen, leaned his shotgun against a tree, and went into the house. He was arrested several hours later.

Appellant repeatedly insisted that he believed his life was in danger at the time he fired at Allen. He stated that he did not call 9–1–1 to help Allen because he did not know Allen was injured. Appellant admitted to having had a drinking problem in his past, but stated that he only had two beers on the night in question. Appellant also admitted he did not tell the police the truth when they first interviewed him, because he was scared and because he did not feel they were being truthful with him.

Following trial, the jury convicted Appellant of murder in the first degree and he was subsequently sentenced to life imprisonment without the possibility of parole. This appeal followed.

■ Appellant alleges six points of trial court error. In his first point of trial

court error, Appellant maintains that the trial court erred in allowing State's Exhibit # 5 "to go back to the jury during deliberations after such evidence was altered because the exhibit no longer represented the exhibit admitted by the court in that the altered exhibit was misleading and caused extreme prejudice to [Appellant]." Appellant argues that because he made marks on the exhibit during his testimony the exhibit should have been re-admitted into evidence and that it was, thus, an improperly admitted exhibit that should not have been presented to the jury. He also asserts that because he marked on the diagram as part of his testimony, the diagram became testimonial in nature and was improperly allowed to be seen by the jury during its deliberations.[6]

During the course of the police investigation, Lieutenant Gideon created a diagram of the crime scene based on his notes and other officers' notes and observations. At trial, this diagram was entered into evidence by the State as State's Exhibit # 5 and the State used the diagram to illustrate several points. Lieutenant Gideon testified that the drawing was not to scale, but was meant to "show[ ] where things [were] in relationship to each other." Defense counsel objected to the introduction of the diagram on the basis that Lieutenant Gideon "created this himself, it's self-serving." In overruling defense counsel's objection, the trial court stated that "the issue is, is whether or not it is of some benefit to the jury ..." and reminded defense counsel that he would have "the opportunity to cross-examine upon the exhibit." [7]

Later, during the course of Appellant's testimony, Appellant himself made marks on the diagram to reflect his recollection of the scene which he felt differed from the rendition on the diagram.

Thereafter, during its deliberations, the jury sent a note to the trial court requesting to see "the diagram not drawn to scale." Defense counsel objected to the jury's request and argued the jury should not be permitted to view the diagram because "it was offered and admitted as it was, after that the prosecutor modified it or had the witness modify it. After that point it was not re-offered as a changed exhibit and it was not re-admitted." The trial court overruled the objection, and stated it did not "know of any such requirement to do that." The diagram was then sent to the jury room for consideration.

 " 'The decision to send an exhibit to the jury room during deliberations lies within the sound discretion of the trial court.' " *State v. Smith,* 90 S.W.3d 132, 142 (Mo.App.2002) (quoting *State v. Barnett,* 980 S.W.2d 297, 308 (Mo. banc 1998)); *see also State v. Skillicorn,* 944 S.W.2d 877, 896 (Mo. banc 1997). " 'An objecting party has the burden of showing the prejudicial result of sending exhibits to the jury.' " *Smith,* 90 S.W.3d at 142 (quoting *State v. Sullivan,* 925 S.W.2d 483, 485 (Mo.App. 1996)).

 It is our view that the diagram at issue was properly admitted into evidence by the trial court as demonstrative evidence.[8] Appellant does not cite, nor did

---

**6.** There was no objection on this basis in the trial court. "The ground of an objection on appeal is limited to that stated at trial." *State v. George,* 921 S.W.2d 638, 645 (Mo.App. 1996). We will not review this portion of Appellant's argument for that reason.

**7.** Sergeant Vaughn also testified that the diagram "didn't appear to be" to scale.

**8.** "Demonstrative evidence is admissible if it establishes a fact at issue, throws light on the issue, or aids the jury in any way in arriving

this Court's independent examination reveal, any case law which requires that in the factual scenario at hand such evidence must be re-admitted into evidence. Further, the diagram at issue was viewed by the jury during the majority of the trial, and this Court sees no prejudice in allowing the jury to see the diagram during deliberations whether it appeared in its originally submitted form or not. The diagram was properly received in evidence and the trial court did not abuse its discretion in allowing the jury to view it during deliberations. *Smith*, 90 S.W.3d at 142. Point One is denied.

In Appellant's second point of trial court error, he maintains the trial court erred in overruling his motion to suppress certain statements he made to the police on the night of the murder and the following morning. He asserts these prejudicial statements were not only involuntary and coerced, but were also "based upon promises [by law enforcement] that [Appellant] would not be charged with premeditated murder. . . ." Additionally, Appellant maintains he "asked for a lawyer more than once during questioning and law enforcement did not cease questioning him."

Appellate review of a trial court's ruling on a motion to suppress is limited to a determination of whether the evidence was sufficient to support the finding. *State v. Edwards*, 116 S.W.3d 511, 530 (Mo. banc 2003). This Court will view the evidence in a light most favorable to the judgment and will reverse the judgment only if clearly erroneous. *Id.* The Court will consider all evidence presented at trial, including evidence presented at a pretrial hearing. *Id.*

A trial court's ruling on a motion to suppress is interlocutory and is subject to change during trial. *State v.*

at the correct verdict." *State v. Ford*, 867

*Shifkowski*, 57 S.W.3d 309, 316 (Mo.App. 2001). "Accordingly, a motion to suppress, in and of itself, preserves nothing for appeal, and ordinarily, a point relied on that refers only to a ruling on such motion is fatally defective." *Id.*

"To properly preserve the issue of the admissibility of the evidence sought to be suppressed, the evidence must be objected to at the time it is offered for admission at trial." *State v. Wolf*, 91 S.W.3d 636, 642 (Mo.App.2002); *see also State v. Cardona–Rivera*, 975 S.W.2d 200, 203 (Mo.App.1998). "Accordingly, a point relied on attacking the trial court's ruling on a pretrial motion to suppress, without attacking the court's ruling admitting the evidence, is deficient in that it does not identify the actual ruling that is subject to challenge and, therefore, does not preserve the issue for appellate review." *Id.* " 'Failure to object at the earliest opportunity to the admission of evidence constitutes a waiver of the claim.' " *State v. Evenson*, 35 S.W.3d 486, 491 (Mo. App.2000) (quoting *State v. Stewart*, 17 S.W.3d 162, 166 (Mo.App.2000)).

Here, Appellant made statements to the police on numerous occasions. He was interviewed by Sergeant Vaughn at his home on the evening of January 19, 2003, before he was arrested and he was interviewed by Sergeant Vaughn the following morning at the Stone County Jail. During both of these interviews Appellant maintained he was not involved in Allen's death. Thereafter, Appellant was interviewed on several other occasions, all of which were videotaped by the authorities. In the latter interviews, Appellant confessed to being involved in Allen's death.

On February 17, 2004, Appellant filed a motion to suppress the statements he

S.W.2d 681, 684 (Mo.App.1993).

made to authorities both before and after his arrest. Following a hearing on February 20, 2004, the trial court overruled Appellant's motion.

At trial, Sergeant Vaughn testified at length on direct examination without objection from defense counsel regarding the various statements Appellant made to police. Thereafter, defense counsel cross-examined Sergeant Vaughn regarding the statements. Saliently, it was defense counsel who played Appellant's confession for the jury and offered two videotaped interviews, together with a transcript of Appellant's confession, into evidence.

■■■ Although it might have been the trial strategy of defense counsel to not object to the introduction of Appellant's confessions, in an attempt to lessen the impact of such a confession, nevertheless, "a 'specific objection to evidence at the time the evidence is offered is required to preserve the issues for appellate review, and the failure to object at the earliest opportunity constitutes a waiver of that claim.' " *State v. Patton*, 157 S.W.3d 278, 283 (Mo.App.2005) (quoting *State v. Collins*, 72 S.W.3d 188, 194 (Mo.App.2002)). "The rules of appellate review require an objection and proper request for relief as a predicate to examination on appeal of matters arising at trial." *State v. Hensley*, 83 S.W.3d 681, 687 (Mo.App.2002). By failing to object to the receipt into evidence of his statements to the police, Appellant waived this claim of error. Point denied.

■■■■ For ease of analysis we now review Appellant's remaining points out of order. In Appellant's sixth point on appeal, he asserts the trial court erred in admitting "multiple gory, gruesome and inflammatory photographs of the deceased ... because the photographs were used to shock and inflame the jury's prejudices against [Appellant]." He maintains that not only were the photographs duplicative,

but their "prejudicial effect outweighed the probative value of this evidence." " 'Photographs, although gruesome, may be admitted where they show the nature and location of the wounds, where they enable the jury to better understand the testimony, and where they aid in establishing any element of the state's case.' " *State v. Middleton*, 995 S.W.2d 443, 462 (Mo. banc 1999) · (quoting *State v. Murray*, 744 S.W.2d 762, 772 (Mo. banc 1988)). " 'It is within the discretion of the trial court to determine whether potentially prejudicial or inflammatory evidence should be admitted, and relevancy is the principal criterion.' " *State v. Simpson*, 908 S.W.2d 839, 842 (Mo.App.1995) (quoting *State v. Wood*, 596 S.W.2d 394, 403 (Mo. banc 1980)). "A photograph, generally speaking, is superior to words as a means of description, and it should not be rejected because by presenting an accurate portrayal it tends to be inflammatory." *State v. Burnfin*, 606 S.W.2d 629, 630 (Mo.1980) (internal citation omitted). "The admission of photographs is a discretionary act and will be found erroneous only if the ruling resulted in fundamental prejudice and an abuse of discretion." *State v. Wilhite*, 858 S.W.2d 293, 295 (Mo.App.1993).

Here, the State showed various witnesses pictures of the deceased and the crime scene at issue and requested that the photographs be admitted into evidence. Defense counsel objected that some of the pictures were duplicative in that they were merely close-ups of other pictures. The trial court found that some of the pictures were "from a different angle ..." and that the close-up photographs "exemplifie[d] the wounds and be some [sic] evidence of the death of the decedent." Accordingly, the trial court overruled Appellant's objection and the photographs were admitted. Later, defense counsel objected to another series of photographs of the crime scene

from "various angles" and the trial court again overruled the objection.

The photographs at issue revealed the nature and extent of the wounds Allen suffered and aided in proving the State's case. "Insofar as the photograph may be shocking or gruesome, it is because the crime is of that sort. 'Gruesome crimes produce gruesome, yet probative, photographs.'" *State v. Burris*, 32 S.W.3d 583, 591 (Mo.App.2000) (citation omitted). As the photographs helped the jury to understand the nature of the crime, their admission was not error. Further, there is no merit to Appellant's argument that certain of the photographs were duplicative of photographs already entered into evidence. Generally, "prejudice does not exist when the objectionable evidence is merely cumulative of other evidence that was admitted without objection and that sufficiently establishes 'essentially the same facts.'" *State v. Haddock*, 24 S.W.3d 192, 196 (Mo. App.2000) (quoting *State v. Martinelli*, 972 S.W.2d 424, 436 (Mo.App.1998)). Point Six is denied.

In his fourth point on appeal, Appellant maintains the trial court erred in allowing testimony relating to the fact that he "possessed drug paraphernalia at his home prior to [his] arrest." According to Appellant, such testimony regarding prior uncharged misconduct was both prejudicial and irrelevant. Appellant concedes that he did not properly preserve this point for appellate review and, therefore, requests plain error review under Rule 30.20. Plain error review is used sparingly and is limited to those cases where there is a clear demonstration of manifest injustice or miscarriage of justice. *State v. Ballard*, 6 S.W.3d 210, 214 (Mo.App.1999). Claims of plain error are reviewed "under a two-prong standard." *State v. Roper*, 136 S.W.3d 891, 900 (Mo.App.2004). "In the first prong, we determine whether there is, indeed, plain error, which is error that is 'evident, obvious, and clear.'" *Id.* (quoting *State v. Scurlock*, 998 S.W.2d 578, 586 (Mo.App.1999)). "If so, then we look to the second prong of the analysis, which considers whether a manifest injustice or miscarriage of justice has, indeed, occurred as a result of the error." *Id.* "A criminal defendant seeking plain error review bears the burden of showing that plain error occurred and that it resulted in a manifest injustice or miscarriage of justice." *Id.* "The outcome of plain error review depends heavily on the specific facts and circumstances of each case." *Id.*

Based on the facts and circumstances of this case, we decline to exercise plain error review. *See Roper*, 136 S.W.3d at 900. Here, there were numerous instances in both the State's case in chief and in Appellant's presentation of his case where there were references to Appellant's possession of a marijuana pipe. In its opening statement, the State, in outlining its case for the jury, noted that Appellant was arrested and taken into custody on the night of the murder for possessing a marijuana pipe which the police officers found in his home. Defense counsel did not object to this reference. During Deputy Cox's testimony, Deputy Cox repeatedly mentioned the fact that Appellant "attempted to hide [the pipe] under [a] chair" while he was being interviewed. During his cross-examination of Deputy Cox, defense counsel even asked Deputy Cox "how long had you been there prior to your finding the pipe?" Additionally, there were numerous instances of other witnesses referencing the marijuana pipe without objection by defense counsel. Indeed, defense counsel even mentioned the marijuana pipe in its own closing argument.

To hold that a miscarriage of justice or a manifest injustice occurred, we must determine that there is a reasonable

probability that the jury's verdict would have been different, had the error not taken place. *State v. Dorsey*, 156 S.W.3d 791, 805 (Mo.App.2005). The evidence admitted at trial, including the testimony of Appellant himself, undermines his claim that but for the evidence that a marijuana pipe was seized from his home the jury's verdict would have been different. Appellant has failed to demonstrate that manifest injustice or a miscarriage of justice occurred. *Patton*, 157 S.W.3d at 284. Point denied.

■ In Appellant's fifth point on appeal he maintains the trial court erred in allowing a photograph of the marijuana pipe, State's Exhibit # 3, to be entered into evidence. Appellant once again requests plain error review as in Point Four above.

■ During direct examination by the State, Deputy Cox identified a photograph of the marijuana pipe in question, which was identified as State's Exhibit # 3. The State asked that the photograph be admitted into evidence and defense counsel announced, "No objection." "An announcement of 'no objection' amounts to an affirmative waiver of appellate review of the issue." *State v. Markham*, 63 S.W.3d 701, 707 (Mo.App.2002); *see also State v. Burge*, 39 S.W.3d 497, 499 (Mo.App.2000). "Under those circumstances, even plain error review is not warranted." *Markham*, 63 S.W.3d at 708–09. Accordingly, we decline to exercise plain error review. The photographic evidence was properly admitted by the trial court. Point denied.

■ Appellant's third point on appeal asserts the trial court erred in overruling his motion for judgment of acquittal at the close of all the evidence. He argues that the State's evidence was insufficient to allow a reasonable fact finder to determine that he "knowingly caused the death of Keith Allen after deliberation." " 'We review the denial of a motion for acquittal to determine if the State adduced sufficient evidence to make a submissible case.' " *State v. Howard*, 973 S.W.2d 902, 906 (Mo.App.1998) (quoting *State v. Foster*, 930 S.W.2d 62, 63 (Mo.App.1996)). "Our standard of review is whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt." *State v. Wright*, 998 S.W.2d 78, 81 (Mo.App. 1999). The court must examine the elements of the crime and consider each in turn; reviewing the evidence in the light most favorable to the judgment, disregarding any contrary evidence, and granting the State all reasonable inferences from the evidence. *State v. Whalen*, 49 S.W.3d 181, 184 (Mo. banc 2001). We defer to the superior position of the jury to assess the credibility of witnesses and the weight and value of their testimony. *State v. Nichols*, 20 S.W.3d 594, 597 (Mo.App.2000).

■ "A person commits the crime of murder in the first degree if he knowingly causes the death of another person after deliberation upon the matter." § 565.020.1. "Deliberation" required for conviction for murder in the first degree is defined as "cool reflection for any length of time no matter how brief." § 565.002(3); *see also State v. Johnston*, 957 S.W.2d 734, 747 (Mo. banc 1997). "Proof of deliberation does not require proof that the defendant contemplated his actions over a long period of time, only that the killer had ample opportunity to terminate the attack once it began." *Id.* (internal citation omitted). "It is sufficient to show that the defendant merely considered taking another's life in a deliberate state of mind." *State v. Stacy*, 913 S.W.2d 384, 387 (Mo.App.1996).

■ Deliberation required for conviction for murder in first degree may "be

proved by indirect evidence and inferences reasonably drawn from circumstances surrounding the killing." *State v. Howard,* 896 S.W.2d 471, 480 (Mo.App.1995). The inference of deliberation can be strengthened by the fact that a defendant left the scene of the crime immediately after shooting without checking on the victim; that defendant failed to procure aid for the victim; and that defendant disposed of the weapon used in the shooting. *Id.* at 481. "Deliberation c[an] also be inferred from the number, severity, and location of wounds to the victim[ ]." *Id.*

In the present matter, there was sufficient evidence to prove that Appellant "knowingly caused the death of Keith Allen after deliberation." Zlotopolski testified that there had been hostility between Allen and Appellant at the time the murder was committed. She went on to detail the fact that Appellant had repeatedly trespassed on Allen's property on the day of the murder. Zlotopolski stated that Allen had been concerned enough by Appellant's actions to send her and her children back to the house and to leave the house after dark to lock the gate.

Appellant himself testified that he was feeding the turkeys, heard what he suspected was Allen's truck, and went to the location where he thought Allen would be—all the while with a loaded shotgun on the seat of his truck. Further, Appellant shot Allen three times using a "pump action" shotgun which had to be pumped between each shot. After the shootings, Appellant failed to check on Allen or to even assist him in case he was injured. *See Howard,* 896 S.W.2d at 481. Nor did he call law enforcement authorities regarding the matter. When the police interviewed him, Appellant initially denied any involvement in the murder and even stated he had not talked to Allen in several years. All of these facts lead to the conclusion that Appellant deliberately caused Allen's death.

 Finally, we note that the jury was not required to accept Appellant's testimony that his actions were in self-defense and that he was in danger of death or serious bodily harm at the time he shot Allen.[9] Appellant's "description of his mental state is not binding on the jury." *State v. Mitchell,* 975 S.W.2d 191, 196 (Mo. App.1998). The jury is not bound by any self-serving claims made by Appellant and is entitled to reject any or all of his testimony as false. *See State v. Gunn,* 57 S.W.3d 347, 350 (Mo.App.2001) (holding that "the jury is entitled to accept the State's evidence as true, and reject the defendant's testimony as false"). The jury could reasonably have found that Appellant's testimony in this regard was not credible and that Appellant was not in fear of death or in fear of serious bodily harm when he shot Allen, but acted knowingly and with deliberation when Appellant shot Allen on three, separate occasions. Point denied.

The judgment of the trial court is affirmed.

SHRUM, P.J., and BATES, C.J., *concur.*

---

9. "Self defense requires ... a real, specific, actual and immediate threat of bodily violence to which the defendant's actions are an appropriate and proportional response." *State v. Harris,* 870 S.W.2d 798, 809–10 (Mo. banc 1994). "[S]elf-defense may be justification for the use of physical force when and to the extent a person reasonably believes such force is necessary to defend himself from what that person reasonably believes to be the use or imminent use of unlawful force by the other person." *State v. Watson,* 839 S.W.2d 611, 614 (Mo.App.1992).